**AMERLINE CORPORATION and Honeywell, Inc., Plaintiffs,**

v.

**COSMO PLASTICS COMPANY, Defendant.**

Civ. A. No. 64 C 617.

United States District Court
N. D. Illinois, E. D.

May 10, 1967.

George B. Newitt, of Bair, Freeman & Molinare, Chicago, Ill., for Amerline Corp.

Walther E. Wyss, of Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., John F. Pearne, McNenny, Farrington, Pearne & Gordon, Cleveland, Ohio, for Cosmo Plastics Co.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

LYNCH, District Judge.

I. FINDINGS OF FACT

*The Parties and Jurisdiction*

1. This is a patent infringement action filed April 8, 1964, seeking an injunction and damages for infringement of three patents, all of which are directed to the provision of a slot in a flange of admittedly old bobbins or winding forms for accommodating the beginning or lead-in wire of the winding on such bobbins or winding forms. Defendant contends that the three patents in suit are invalid but, if valid, Defendant admits

that the single form of slot used in the bobbins which it manufactures renders these bobbins an infringement (or contributory infringement) of all three patents.

2. Plaintiff, Amerline Corporation (hereinafter referred to as "Amerline"), formerly American Molded Products Company, was a corporation of the State of Illinois having its principal place of business in Chicago, Illinois. After commencement of this action, it assigned all its assets and liabilities to C-R Plastics Corporation, an Illinois corporation which, by change of name, became Amerline Corporation and also has its principal place of business in Chicago, Illinois. The latter Amerline Corporation has been substituted for the former Amerline Corporation as one of the Plaintiffs.

3. Plaintiff, Minneapolis-Honeywell Regulator Company (hereinafter referred to as "Honeywell"), is now, by change of name, Honeywell Inc., and is a corporation of the State of Delaware, having its principal place of business in Minneapolis, Minnesota.

4. Defendant, Cosmo Plastics Company (hereinafter referred to as "Cosmo"), is a partnership having its principal place of business in Cleveland, Ohio.

5. The Court has jurisdiction of the parties and the subject matter [Amended Complaint and Answer].

6. In addition to the instant litigation which initially included Magnecraft Electric Company as a Defendant, Plaintiffs, on April 8, 1964, filed two additional suits in this District against customers of Defendant, all involving the same three patents: Civil Action No. 64 C 618, Amerline Corporation and Minneapolis-Honeywell Regulator Company v. Electro Counter & Motor Co.; Civil Action No. 64 C 619, Amerline Corporation and Minneapolis-Honeywell Regulator Company v. Comar Electric Co. On November 30, 1964, the Complaint in the instant suit was dismissed without prejudice as to Defendant's customer, Magnecraft Electric Company, and on November 30, 1964, the suits against the other two customers of Defendant, Civil Actions Nos. 64 C 618 and 64 C 619, were dismissed without prejudice.

*Ownership of Patents and the Right to Sue*

7. Patent No. 3,083,930 (PX 1A), assigned to Honeywell, issued in the name of Byron O. Brekke April 2, 1963, on an application filed August 13, 1959, and is entitled "Winding Form". Patent No. 3,117,294 (PX 3A), assigned to Amerline, issued in the names of Peter C. Muszynski and Arthur G. Weyrich January 7, 1964, on an application filed September 8, 1959, and is entitled "Bobbin with Insulated Lead-In Means". Patent No. 3,131,371 (PX 2A), assigned to Honeywell, issued in the names of Byron O. Brekke and Roy C. Johnston April 28, 1964, on an application filed March 9, 1959, and is entitled "Winding Form Having Means for Protecting Electrical Coil Leads" [PX 1A, 2A, 3A].

8. Amerline has an exclusive license under both Honeywell patents, under which license Amerline pays a royalty on its production to Honeywell; and Honeywell has a free, non-exclusive license under the Amerline patent. Amerline has the right to sue under all three patents in suit.

*Disclosures of the Patents in Suit*

9. All three patents in suit and the claims thereof are primarily concerned with the provision of a slot in the flange of a winding form or bobbin adapted to be molded from plastic materials having insulating properties and comprising a hollow core or tube, on which an electrical coil is wound, and flanges at each end of the tube and, in some cases, intermediate the ends of the tube, to define one or more winding zones or spaces in which the turns of a single coil or a plurality of coils may be confined and retained in place during and after the winding operation. Such winding forms are commonly termed "bobbins".

10. The Brekke patent discloses bobbins having either of two slot forms, one (Figs. 1–5) being a diagonal slot running completely through the flange from the winding zone to the outer surface of the

flange and from the tube of the bobbin to the peripheral edge of the flange, and the other (Fig. 6) running diagonally into the flange from the winding zone and extending from the tube through the peripheral edge of the flange, but not passing through the outer surface of the flange so that the outer surface is "continuous". This patent also discloses a terminal lug mounted on each slotted flange adjacent the slot therein for connection too a lead wire emerging from the slot. Plaintiffs characterized this patent as directed to a diagonal slot extending all the way through the bobbin flange.

11. The Brekke et al. and Muszynski et al. patents disclose substantially identical bobbins having substantially identical slots, and the bobbins of both of these patents have terminal lugs mounted on each slotted flange and substantially identically located in the two patents relative to the flange slots. In both of these patents, the flange slots include a portion which extends into the flange from the winding space along the inner surface of the flange from the bobbin tube out to the peripheral edge of the flange. This slot portion is intersected at right angles by a second slot portion which extends parallel to the flange between the inner and outer surfaces thereof, without penetrating through the outer flange surface, so that the slots appear L-shaped when viewing their configurations where they open out through the peripheral edges of the flanges. Plaintiffs inaccurately characterized the Brekke et al. patent as directed to a diagonal slot which does not extend all the way through the bobbin flange (no such slot form being disclosed therein) and the Muszynski et al. patent as directed to an L-shaped slot in the bobbin flange.

*The Patent Claims in Suit*

12. The specific claims in suit are claims 4 and 5 of Brekke patent No. 3,083,930, claims 1–4 (all claims) of Muszynski et al. patent No. 3,117,294, and claims 1, 2 and 3 (all claims) of Brekke et al. patent No. 3,131,371.

13. The broadest of the claims in suit are claims 4 and 5 of the Brekke patent. These claims read on bobbins having a flange that is slotted in either of the two diagonal slot forms disclosed in this patent, i.e., whether or not running completely through the flange from the winding zone to the outer surface of the flange. These claims are broad enough to read also on bobbins having the L-shaped slots disclosed in both of the other two patents in suit and present in all of the accused bobbins of Defendant.

14. The next broadest claims are the three claims of the Brekke et al. patent. These claims read on bobbins having the diagonal slot not passing completely through the flange (Fig. 6 of the Brekke patent), and also on bobbins having the L-shaped slot. Because they call for a continuous outer surface of the slotted flange, these claims do not read on the diagonal slot extending all the way through the flange (Figs. 1–5 of the Brekke patent).

15. The claims of the Muszynski et al. patent in suit are specific to an L-shaped slot referred to as "a flat pocket" disposed between the inner and outer flange surfaces "substantially parallel therewith" and "being completely closed at said outer surface", thus distinguishing from the two diagonal slots disclosed in the Brekke patent. The claims of the Muszynski et al. patent additionally define the slot as having "a narrow elongated opening" through the inner flange surface that is coextensive with the pocket "to provide access to said pocket" from the winding space (i.e., from the bobbin tube out to the peripheral edge of the slotted flange), a feature also present in each of the slot forms disclosed in the Brekke and Brekke et al. patents.

16. Claims 3 and 4 of the Muszynski et al. patent additionally call for "a conductive terminal lug mounted" on the slotted flange "adjacent said pocket", this being a feature also disclosed both in the first Brekke patent and in the Brekke et al. patent [DX 137]; and claim 4 of the Muszynski et al. patent additionally calls for "a continuous length of wire

coiled about said tube in multiple layers, the inner end of said wire in the layer adjacent said tube passing through said access opening at the inner end of said opening, into said pocket, out past said peripheral edge, and connecting to said lug," this being a feature identically disclosed in the Brekke et al. patent and substantially identically in the Brekke patent.

17. Both the terminal lug and coil wire recited in claims 3 and 4 of Muszynski et al. were also present in the "ordinary" bobbins of the prior art (illustrated by the models PX 4 and PX 5) as "it was customary in the past" to wind them, with a piece of tape or a split washer forming "a protective barrier" between the beginning lead of the wire and the successive layers of adjacent turns of a coil in the winding space. Thus, these limitations may not be considered as defining anything invented by Muszynski et al. or as being a novel feature of their patent.

18. Except for recitations of features common in the prior art (Findings 16 and 17, supra), the only significant difference between the claims of the three patents in suit resides in the form of the flange slots defined therein for providing an insulating barrier separating the portion of the beginning lead wire, which extends through the slot in the bobbin flange, from successive layers of adjacent coil turns in the winding zone of the bobbin and from external iron of a transformer core or the like that might be disposed adjacent the outer surface of the slotted flange.

19. The only difference between the claims of the three patents in suit and one or more items of prior art considered by the Patent Office also resides solely in the form of the bobbin flange slots disclosed in the patents in suit for receiving and insulating the beginning lead wires [DX 96, pp. 17–20, 30–33, 38–40, 44–45, 51–53, 55–57, 62–64; DX 97, pp. 38–43, 48–51, 62–64, 76–80, 87–91; DX 98, pp. 20–22, 35–36, 53–57].

20. Any novelty in any of the patent claims in suit must be found to reside in the mere form, shape, or proportions of the slots provided in flanges of bobbins to receive and insulate the lead wires of coils wound on the bobbins.

*Advantages Attributed to Subject Matter of the Claims in Suit*

21. The principal advantage attributed by Plaintiffs to the slot forms of the claims in suit is that they reduce the manual operations in starting the winding of a coil by eliminating the need for manually positioning the beginning lead and a protective tape or washer or the like over the lead, or by enabling quicker and easier insertion of the beginning lead into the particular slot forms of the patents than into the holes, grooves, or slots used in various prior art bobbins. The result is asserted to be a saving in labor costs.

22. The slot forms of the patents in suit are also asserted by Plaintiffs to lend themselves to automatic winding at a substantial cost saving per unit [P.Br. 11–12, 13, 38]. This advantage is mentioned in the Brekke and Brekke et al. patents (PX 1A, 2A), but not in the Muszynski et al. patent (PX 3A). However, none of those three patents discloses how the patented bobbins could be automatically wound, or any machinery for doing so, or the degree of automation contemplated.

23. There is no evidence that any of the bobbins of the patents in suit has ever been wound completely automatically, or that the diagonal slot forms disclosed in the Brekke patent were ever made or used commercially or could be successfully wound with any degree of automation.

24. The only evidence that even the L-shaped slot was commercially successful, or increased the degree of automation of the winding operation, or reduced costs, as compared to prior art slotted bobbins, related to the winding of bobbins (PX 14, 18, 19, 20, 21, 22, 23, 23A, 41) in which the inner surface of the bobbin flange adjacent the slot opening had been formed on a bevel sloping into the slot so as to facilitate sliding of the wire into the slot at the beginning of

the winding operation. This appears to have been a later improvement, since it was not disclosed in any of the patents in suit and was not used in Plaintiffs' original production of bobbins having the L-shaped slot.

25. The only evidence of cost savings resulting from the use of L-shaped slots having the aforesaid beveled opening from the winding space also indicated that such bobbins were wound by Honeywell on the same machines previously used by it for winding unslotted bobbins while manually applying tape over the beginning lead to protect and insulate it from adjacent turns of successive coil layers. The asserted savings were the prior labor cost of manually positioning the beginning lead and applying the tape, but the evidence failed to take into account or disclose what increase in bobbin costs resulted from molding them with L-shaped flange slots.

26. The evidence fails to establish that the cost savings or commercial success attributed to the L-shaped slot would have resulted but for other improvements in the bobbins, in molding techniques, and in winding machines and procedures that were not disclosed in and, hence, are not attributable to any of the patents in suit.

*Histories of the Patents in Suit*

27. Of the three patents in suit, the application for the Brekke et al. patent disclosing only the L-shaped slot form was the first to be filed, but it was filed in the name of Brekke, alone, as the sole inventor [DX 97, pp. 1, 13–14]. After the first Patent Office action, the application was amended to name Roy C. Johnston as a joint inventor with Brekke, the amendment being supported by a "STATEMENT OF FACTS" in the form of an affidavit by both Brekke and Johnston.

28. On September 8, 1959, the application for the Muszynski et al. patent in suit was filed by counsel for Amerline, disclosing virtually the identical structure with the L-shaped slot disclosed in the Brekke et al. application.

29. On January 29, 1962, the Brekke et al. and Muszynski et al. applications (DX 97 and 98) were placed in interference on two counts or claims (DX 99). During the succeeding year, the parties settled the interference by cross-concessions of priority attributing the invention of one of the counts to Brekke et al., and of the other to Muszynski et al. Immediately thereafter, both parties cancelled both of the interference counts from their respective applications, stating their belief that they did not distinguish over a Howenstine patent of DeLuxe Coils, Inc., No. 3,014,164, granted December 19, 1961, but not discovered by the parties until after the interference between them had been declared.

30. Brekke et al. and Muszynski et al. explained the settlement of their interference to the Patent Office in their respective applications and in the file of the interference on the ground that they had determined that Brekke et al. were the first inventors in developing the diagonal slot that does not go completely through the flange, whereas Muszynski et al. were the first to develop the L-shaped slot in which a portion of the slot extends parallel to the inner and outer surfaces of the flange. Accordingly, Brekke et al. presented new claims drafted to read on such a diagonal slot and to distinguish from Howenstine patent No. 3,014,164 by calling for the outer surface of the slotted flange to be "continuous". In support of these new claims, Brekke et al. argued that Brekke, alone, invented only the diagonal slot that passed completely through the flange, so that the new claims of Brekke et al. also distinguished from the Brekke application (still pending at that time in another Division of the U. S. Patent Office). In doing this, Brekke et al. stated that, in the Brekke application, the diagonal slot "does pass completely through the flange", but did not inform the Examiner handling their joint application in Group 270 that the sole Brekke application (in a different Examining Division or Group) also disclosed a diagonal slot *not* passing completely

through the flange. In due course, based upon those representations to the Patent Office, the Brekke et al. patent was granted with claims allegedly directed to a diagonal slot *not* passing completely through the flange as disclosed and already patented in the Brekke patent.

31. All of the relevant evidence introduced at the trial, including the file histories of the Brekke and Brekke et al. patents in suit, shows that Brekke, alone, invented the diagonal slot that does not pass completely through the flange, as well as the diagonal slot that does pass completely through the flange.

32. Following the conclusion of the interference between Brekke et al. and Muszynski et al. and based upon the settlement thereof, the Muszynski et al. patent in suit was granted with all of its claims directed to the L-shaped slot.

*Sequence and Dates of Slot Form Developments by Plaintiffs' Patentees*

### 1. *Diagonal Slots*

33. The earliest evidence of any conception of the subject matter of any of the patents in suit by any of Plaintiffs' patentees is a sketch DX 4-A dated "12/9/57" and bearing Brekke's initials. It shows the diagonal slot form of Figs. 1–5 of the Brekke patent in suit, in which the slot passes completely through the flange. Only Brekke testified regarding that sketch, which he said was made "some time late in 1957".

34. From the December 1957 conception by Brekke shown by DX 4-A until May 7, 1958, when Weyrich of Amerline and an Amerline representative, Lenmark, visited Honeywell and conferred with Brekke and Johnston of Honeywell, there is no evidence of even a conception by any of Plaintiffs' patentees of any other specific slot form like the subject matter of any of the patents in suit, or any work by them on such slot forms.

35. Only Brekke testified regarding any discussion or disclosure of the subject matter of any of the patents in suit at the meeting of May 7, 1958. The most that could be derived from Brekke's uncorroborated testimony is that Brekke disclosed to Weyrich at that meeting the slotted bobbin design of his sketch DX 4-A and that, with reference to a number of flanges cut from bobbins and having slots sawed therein, there was some consideration at the meeting of diagonal slots not passing completely through the flange. There is no suggestion in the testimony of Brekke and no evidence in the record that any of the slots sawed in those flanges might have been suitable for receiving and insulating the beginning lead of a coil, or that anyone tried to place a wire in any of those slots, or that anyone concluded that any of them was a practical slot for that purpose.

36. The physical model DX 8 is the only physical bobbin having a diagonal slot completely through the flange that was introduced in evidence, and that exhibit has no probative value. It has a tag attached thereto indicating that it was given to Weyrich by Brekke on May 7, 1958, but the tag was put on the model by the secretary of Plaintiffs' counsel and is not evidence of the facts stated thereon. Brekke made it clear that he had no recollection of that particular model at the time of his testimony at the trial, and said nothing to indicate that it was satisfactory for its intended purpose. No other witness testified regarding that model and no conclusion as to the date of that model can be reached from the evidence.

37. The only inventive acts by or on behalf of Brekke or Brekke et al. as to which there is any meaningful evidence in the record involve a conception by Brekke, possibly as early as December 9, 1957, of a bobbin having a diagonal flange slot passing completely through the flange, and a discussion at the meeting of May 7, 1958, at Honeywell of a similar diagonal slot not passing completely through the flange. All of the relevant evidence shows both of those diagonal slot versions to have been conceived by Brekke, alone, and disclosed to Johnston of Honeywell and Weyrich of Amerline. There is no record evidence of any probative value that either of

those two diagonal slot forms was ever actually reduced to practice.

38.  Only a constructive reduction to practice of the two diagonal slot forms by the filing of the Brekke sole application on August 13, 1958, is supported by the record.

39.  There is no evidence of any conception or reduction to practice of anything by or on behalf of Brekke et al. prior to March 9, 1959.  This is the filing date of the Brekke et al. application for the L-shaped slot that matured into the Brekke et al. patent in suit.

### 2.  *L-Shaped Slot*

40.  Weyrich testified that, after the meeting of May 7, 1958, at Honeywell, he participated in a meeting of Amerline personnel at Amerline, during which a conception of the L-shaped slot was developed as shown by sketches DX 6 and DX 7 prepared by a Mr. Chester Tellen and respectively dated May 12 and 13, 1958.  There is nothing in Weyrich's testimony indicating that he or Muszynski contributed to that conception, which Weyrich said he had never "disclosed or heard of * * * prior to that time".  His testimony, at most, indicates his own awareness of the L-shaped slot concept by May 12, 1958. There is no other record evidence corroborating Weyrich in this regard, or otherwise explaining the sketches DX 6 and DX 7.

41.  DX 27 is a handmade model of a bobbin having an L-shaped slot formed in one flange thereof and having a tag attached thereto stating that it was "supplied on May 21, 1958 by American Molded Products Company (similar sample retained by American Molded)". Weyrich was unable to identify that model, and the testimony of Brekke is vague as to the information supplied on the tag attached thereto (apparently by Plaintiffs' counsel at an undetermined time).  Brekke did state that he had seen another model "exactly like" DX 27 at Amerline the first part of June, 1958. At best, this evidence would tend to establish that the model DX 27 was made by someone at Amerline before the middle of June 1958.

42.  Brekke testified that, merely by looking at the model similar to DX 27 which he said he had received, he and someone else not identified concluded that it would be "very feasible" to wind the bobbin.  He stated that DX 27 "was not satisfactory for production" because of the opening outwardly through the flange at the bottom of the flange slot, and that the opening could be closed as a matter of "ordinary engineering design".

43.  Brekke explained how a wire *would* be put onto the terminal and into the slot of a model by hand to see if the wire would fit into the slot, and that it wouldn't make any difference whether one or two turns of wire were also applied to the bobbin, but he did not state that any such hand test of DX 27 or of a model like it was made by anyone at any particular time, and there is no evidence as to when the wire on that model was applied thereto.

44.  Between early June, 1958, and September, 1958, Plaintiffs worked together to finalize a bobbin design like DX 27 having an L-shaped slot; Amerline made a temporary mold and produced such bobbins thereon for testing by Honeywell; and Brekke had the test bobbins built into a product at Honeywell and tested to see if the product would meet Honeywell's coil specification.  Brekke stated that the results of such tests were satisfactory, with some minor revisions as to the configuration of the bobbin.  The first temporary mold for such bobbins was not completed by Amerline until August 20, 1958, so that the first such bobbins were not tested until after that date.

45.  A Honeywell test report dated September 23, 1958, was stipulated to be authentic.  The report shows a bobbin having an L-shaped slot, states how it was tested, and contains conclusions seeming to confirm that the coil windings on the bobbin operated satisfactorily, though no witness so testified with reference to that report.

46. Giving full credence to the testimony of Brekke, alone, reduction to practice of a bobbin having the L-shaped slot by the making and mere inspection of a handmade model by early June, 1958, and, more convincingly, by the molding, winding and testing of such a bobbin by September 23, 1958, could be found from the evidence. Since such a bobbin was conceived, produced in the form of DX 27 by Amerline, and disclosed by it to Honeywell prior to anything indicating a conception of such a bobbin by Brekke or Brekke et al., any such reduction to practice could inure only to the benefit of Muszynski et al.

### 3. Other Evidence

47. A number of additional documentary exhibits apparently pertaining to Plaintiffs' development of bobbins having various forms of flange slots were stipulated by the parties to be authentic and were received in evidence. These include sketches or drawings PX 42 and 43, and DX 5–A, 13, 14, 14–A, 26, 44, 45, 48, 49 and 50. However, the nature of these exhibits and the testimony or lack of testimony regarding them are such that their possible significance cannot be determined from the record.

48. The sketches PX 42, PX 43, DX 13, the sketches "–28–1" and "–28–2" included in DX 26, and DX 49 all show flange slots that open straight through a bobbin flange in a manner not conforming to the requirements of any of the claims of any of the patents in suit.

49. The sketch DX 5–A, standing alone, is unintelligible and there was no testimony explaining it. An apparent duplicate of DX 5–A included in DX 26 stands in the same light as DX 5–A.

50. The sketch DX 14, dated "5/22/58" and bearing the initials "BOB" and "MHR" in the upper right-hand corner, appears to show two forms of diagonal slots in what may be a flange of a bobbin, and also has a dotted line representation of an L-shaped slot superimposed on one of the diagonal slots. This exhibit is apparently a duplicate of a similar sketch DX 14–A with added lines in red pencil. However, there is no testimony in the record regarding either DX 14 or DX 14–A, so that the significance of these exhibits cannot be determined from the record. An apparent duplicate of DX 14 included in DX 26 stands in the same light as DX 14.

51. The sketches DX 44 and DX 45 seem to relate to a bobbin having a diagonal flange slot that does not pass completely through the flange. However, these sketches are dated March 11, 1965, and there is no testimony in the record indicating their significance as of any specific earlier date.

52. Except for a memorandum of Plaintiffs' counsel included in DX 26 and which is not evidence of any alleged facts related therein, the balance of that exhibit fails to clarify any important facts in the history of Plaintiffs' developments, and there is no testimony relating thereto.

53. The drawing DX 48 on a Honeywell drawing form appears to show a bobbin having essentially an L-shaped slot of the kind disclosed and claimed in the Brekke et al. and Muszynski et al. patents in suit. This drawing is dated "3/28/58" and carries a revision notation, "slot enclosed," dated "6/9/58," but there is no testimony in the record explaining the significance of this drawing in the light of the concession by Brekke and Johnston that Muszynski and Weyrich were the originators of the L-shaped slot.

54. The drawing DX 50 dated "3–17–58" appears to show a bobbin having an L-shaped flange slot conforming to all of the claims in suit of the three patents in suit. This drawing is on an Amerline drawing form, and Weyrich of Amerline testified that the L-shaped slot shown on the drawing could not have been on that drawing at the time the drawing was originally made and must have been added at some later, undetermined date.

55. On the basis of the foregoing record evidence, the Court finds that the

earliest invention dates that could be accorded to the patents in suit are:

*Brekke patent—3,083,930*

Conception of the diagonal slot completely through the flange on December 9, 1957; and constructive reduction to practice thereof on August 13, 1959. No actual reduction to practice.

Conception of the diagonal slot not passing completely through the flange on May 7, 1958; and constructive reduction to practice thereof on August 13, 1959. No actual reduction to practice

*Brekke et al. patent—3,131,371*

Since Brekke et al. were admittedly not the first inventors of the L-shaped slot disclosed in their patent or of either of the two diagonal slot forms invented by Brekke alone and disclosed and claimed by him in the Brekke patent, the record discloses no invention by Brekke et al. that they conceived or reduced to practice at any time, and they must be deemed to have derived what they disclosed and claimed in their patent from Brekke, alone, and from Muszynski et al.

*Muszynski et al. patent—3,117,294*

Conception of the L-shaped slot on May 12, 1958; the mere making and visual inspection of a model by the middle of June, 1958, and actual reduction to practice on September 23, 1958, by the making, winding, and successful testing of a bobbin having such a slot.

## Defendant's Entry Into the Field

56. All of Cosmo's bobbins accused as infringements of the patents in suit include only the L-shaped form of flange slots exemplified by slotted bobbins depicted in Cosmo's catalogues PX 30, 31 and 32, by the representative bobbin DX 102, and by the greatly enlarged plastic model DX 103 similar to DX 102. Some of these bobbins manufactured by Defendant had no provision for terminal lugs and some did have terminal lugs or provision for the lugs to be mounted by Defendant's customers.

57. Defendant first learned of the L-shaped slot, essentially as incorporated in its accused bobbins, in the fall of 1957 from Barber-Colman. The disclosure to Cosmo by Barber-Colman was in the form of the drawing DX 67 showing the slot narrowed adjacent its opening at the peripheral edge of the flange by a lip provided as an optional aid in retaining the beginning lead in the slot, and in the form of a handmade model which did not include the lead-retaining lip. That disclosure preceded the earliest date of any conception by any of Plaintiffs' patentees of the subject matter of any of the patents in suit.

58. Defendant first manufactured its accused bobbins having the L-shaped flange slot late in 1959 for White-Rogers Company according to its drawing DX 104 dated "9–21–59".

59. From the time Defendant first learned of the L-shaped slot from Barber-Colman in the fall of 1957 until receiving an actual order from Barber-Colman for such slotted flange bobbins about the first of November, 1961, Defendant maintained close liaison with Barber-Colman in an effort to secure such an order. This involved engineering work with Barber-Colman for seven or eight months prior to the order, resulting in the production drawing DX 120 which Defendant followed in filling the order about the end of 1961.

60. Between Defendant's first manufacture of bobbins having L-shaped flange slots for White-Rogers late in 1959 and its manufacture of similar bobbins for Barber-Colman late in 1961, Defendant also manufactured sixteen or more other bobbins of that type for White-Rogers and other customers.

## Prior Art Against the Patents in Suit

### 1. General Prior Art Background

61. The beginning lead and end lead into and out of a coil must be exposed for making electrical connections thereto, and the location and nature of such connections varies widely for different types and sizes of coils and for different coil uses. As a result, a variety of techniques

have been employed for starting and terminating the winding of coils.

62. A variety of techniques have also been employed prior to the inventions of the patents in suit for protecting and insulating the beginning and end leads and, most importantly, the beginning lead or "start wire", or "up end" as it is variously termed in the industry. One such technique commonly employed in the prior art was to lay the start wire against the inner surface of a bobbin flange from the periphery of the flange inwardly toward the tube, manually cover the start wire with a piece of insulating tape applied to the inside surface of the flange, and then perform the winding operation on some kind of winding machine that rotates the bobbin while the wire is fed to it from a supply reel. Other techniques employed in the prior art have used various types of slots and holes in or through a bobbin flange for receiving the start wire and separating it from successive winding turns of the coil.

### 2. Schlattner German Patents

63. The Schlattner German patent No. 849,142 discloses an electrical coil bobbin. That German patent, granted March 25, 1953, was a patent of addition to an earlier Schlattner German patent No. 836,966 disclosing an electrical bicycle generator containing electrical coil bobbins. The bobbin of Schlattner German patent No. 849,142 was disclosed therein for use in the generator of Schlattner German patent No. 836,966. Both of the Schlattner German patents are prior art with respect to all three patents in suit under 35 U.S.C. § 102(b). Neither of them was considered by the Patent Office during the prosecution of any of the three patents in suit.

64. The bobbin of Schlattner German patent No. 849,142 has two diagonal flange slots, one for the beginning lead and one for the end lead of a coil wound on the bobbin. Each slot runs diagonally from an opening to the winding space at the inside surface of the flange upwardly to an opening at the peripheral edge of the flange so that the slot has a "compound" slope for leading the wire

of the coil from the bobbin tube. The inner wall of the slot, over a substantial distance, insulates the lead in the slot from adjacent turns of coil layers in the winding space as effectively and in the same manner as the slots of the Brekke patent.

65. The outer surface of the slotted flange of the Schlattner bobbin is continuous out to the small notch at the point 4 adjacent the peripheral edge of the flange, thus forming an outer slot wall over that distance that insulates a lead in the slot from external iron lamination 7 of the generator of Schlattner German patent No. 836,966 when the bobbin of Schlattner German patent No. 849,142 is used therein as disclosed. If a terminal lug were conventionally mounted in the periphery of the slotted flange of the Schlattner bobbin and adjacent the slot thereof for connection with the lead wire in the slot, the slot would completely insulate the lead wire from anything on the inside or the outside of the flange.

### 3. Barber-Colman Bobbin Designed By Johnson

66. The bobbin designed by Johnson of Barber-Colman in the fall of 1957 involved an L-shaped flange slot for receiving the beginning lead of a coil wound on the bobbin. Various forms were designed by Johnson that differed only minutely in design detail, as illustrated by the drawings DX 67, DX 3 and DX 68 in order of their dates. The slot of each of those designs included a slot-narrowing lip or protuberance adjacent the peripheral edge of the flange, a feature that Johnson considered to be optional. The design of DX 68, taken as exemplary, is reproduced on flap 2 of each of the charts DX 133, DX 134 and DX 135 prepared by Defendant's expert, Fishleigh. A handmade model including a portion of bobbin tube or core and the L-shaped slotted flange, minus the slot-narrowing lip or protuberance, was built by Johnson, shown to other Barber-Colman engineers, and demonstrated to be satisfactory by laying a wire into the slot. Moldability of the design was also determined by inquiries directed to a Black-

hawk Molding Co. and to Defendant, Cosmo. All of this was done in the fall of 1957 prior to the earliest conception of the subject matter of any of the patents in suit by any of Plaintiffs' patentees.

67. The bobbin designed by Johnson of Barber-Colman, except for the L-shaped slot in a flange for receiving the beginning lead to a coil formed on the bobbin, was essentially a conventional bobbin. The simplicity of the L-shaped slot and its intended function were such that the moldability of the bobbin in production and the satisfactory character of the bobbin designed for accomplishing its intended purpose could be determined by competent engineers in the art merely from examination of Johnson's model of the slotted flange and a portion of the bobbin tube or core while applying a wire to the model to demonstrate the slot function. Therefore, the bobbin design of Johnson, as embodied in his handmade model and hand tested, was reduced to practice by him in the fall of 1957 prior to the earliest conception of the subject matter of any of the patents in suit by any of Plaintiffs' patentees.

68. The bobbin designed by Johnson of Barber-Colman is prior art against all three patents in suit under the terms of 35 U.S.C. § 102(g). It was not considered by the Patent Office in the prosecution of any of the patents in suit.

### 4. *DeLuxe Coils Bobbin Designed By Eller*

69. A bobbin designed by Gale Eller of DeLuxe Coils in January, 1958, involved an L-shaped flange slot for receiving the beginning lead of a coil wound on the bobbin. Two such designs were prepared by Eller that differed only minutely in detail, as illustrated by the drawings DX 78 and DX 80 respectively dated "1–16–58" and "1–28–58".

70. A few days prior to July 21, 1958, Eller had a number of bobbins machined out of solid nylon rod according to the drawing DX 80 and incorporating the L-shaped slots for the start lead as shown on that drawing. His purpose was to see if the slots could be incorporated into that product while still maintaining the finished coil dimensions required by DeLuxe Coils' customer. Eller then had some of those bobbins wound with wire on a winding machine under his supervision to form coils thereon, which he electrically tested for "shorts and opens" (short circuits and open circuits), but found none, thus verifying that the coils were satisfactory as regards any shorting of the start lead or wire breakage. One of these bobbins not wound with wire is DX 81. Another that was wound with wire is DX 82. Still another that was wound with wire and wrapped with tape to make a completed coil is DX 83. On the basis of the making, winding, and testing of coils like DX 83, Eller concluded that the bobbins were satisfactory and would enable DeLuxe Coils to eliminate taping the start leads of such coils and cut the costs of production thereof.

71. Eller's testing of his bobbin models like DX 83, having the L-shaped slot, and his conclusion as to the practicality of the design, both generally and for the particular customer whose product was involved, met all proper requirements for reduction to practice of that design at least by July 21, 1958. This was prior to any reduction to practice (actual or constructive) by Brekke, or Brekke et al. and renders the DeLuxe Coils bobbin designed by Eller prior art against the Brekke and Brekke et al. patents in suit under the provisions of 35 U.S.C. § 102(g).

72. The mere making and visual inspection of the model DX 27 by Amerline, without placing a wire in the flange slot to demonstrate its function, did not constitute actual reduction to practice of the L-shaped slot version on behalf of Muszynski et al. Accordingly, Eller's reduction to practice at least by July 21, 1958, was prior to that of Muszynski et al. in September, 1958, and Eller's development was also prior art against the Muszynski et al. patent under the provisions of 35 U.S.C. § 102(g).

73. The Eller DeLuxe Coils bobbin was not considered by the Patent Office in the prosecution of any of the patents in suit.

### 5. *Howenstine Electrical Coil Bobbin*

74. This bobbin was seen in commercial production by Brekke prior to the earliest conception by any of Plaintiffs' patentees, and was disclosed by Brekke to the Patent Office as an admitted prior invention. It is reproduced on flap 3 of each of the charts DX 133, DX 134 and DX 135 prepared by Defendant's expert, Fishleigh. Being prior art against the Brekke patent, the Howenstine electrical coil bobbin is necessarily also prior art against the Brekke et al. and Muszynski et al. patents, and Brekke et al. and Muszynski et al. conceded this.

75. The Howenstine electrical coil bobbin is provided with a flange slot for receiving the beginning lead to a coil wound on the bobbin. This slot includes a first L-shaped portion plus a second narrow slot portion opening directly through the flange from the corner of the L thus making a sort of T-shaped slot.

76. Brekke's attorney, in presenting the Howenstine electrical coil bobbin to the Patent Office as prior art to be considered in the Brekke application, described this second slot portion extending from the corner of the L and directly through the flange thereof as a "defect" requiring that the entire coil assembly be potted with an insulating compound to fill up the second slot portion. The evidence at the trial, however, discloses that the Howenstine electrical coil bobbins were designed specifically for potting or encapsulation after being wound, in order to provide the ultimate in resistance to moisture and mechanical strength and that, because of this, it was feasible initially to form the flange slot opening completely through the flange to provide an additional aid in winding the bobbin, as described at the trial by Howenstine, since the opening would be automatically closed by plastic insulating material after the bobbin was wound and during encapsulation of the finished coil.

Thus, the opening through the outer surface of the flange was not a "defect" as represented to the Patent Office Examiner, but was an added feature serving a utilitarian purpose that would not have been added but for the fact that the entire finished coil was to be encapsulated by insulating material.

77. Although the Howenstine electrical coil bobbin was considered by the Patent Office during the prosecution of the application for the Brekke patent in suit, the significance of that prior art bobbin was incorrectly represented to the Patent Office by Brekke's attorney, who characterized as a "defect" what was in fact an advantageous feature that served a specific utilitarian purpose for Howenstine. In effect, Brekke merely omitted that feature and its function, and this apparently was not recognized by the Patent Office.

78. Neither the Howenstine electrical coil bobbin nor its significance as brought out at the trial were considered by the Patent Office during the prosecution of the Brekke et al. or Muszynski et al. patents in suit.

### 6. *Howenstine Patent No. 3,014,164*

79. This patent was copending in the Patent Office with the three patents in suit, but was granted on an application filed April 16, 1958, prior to conception of the L-shaped slot of the Brekke et al. and Muszynski et al. patents in suit by any of Plaintiffs' patentees. It was acknowledged by Plaintiffs to be prior art against those patents and was called to the attention of the Patent Office by Brekke et al. and Muszynski et al. for consideration as prior art during the prosecution of their applications following termination of their interference.

80. The bobbin of the Howenstine patent is similar to the earlier Howenstine electrical coil bobbin, but less like the bobbins of the Brekke et al. and Muszynski et al. patents in suit by reason of the much larger opening directly through the slotted flange and another opening through the opposite side of that flange of Howenstine.

### 7. *The Brekke Patent in Suit As Prior Art*

81. As regards the Brekke et al. and Muszynski et al. patents in suit, the prior Brekke patent in suit, having been granted on the prior invention of Brekke, is prior art against Brekke et al. and Muszynski et al. under the provisions of 35 U.S.C. § 102(g).

*The Subject Matter of All of the Claims in Suit of All Three Patents in Suit Is Inherently Obvious Within the Meaning of 35 U.S.C. § 103*

82. Any novelty in the subject matter of any of the patent claims in suit must be found to reside in the mere form, shape, or proportions of slots provided in the flanges of bobbins to receive and insulate the lead wires of coils wound thereon. The uncontradicted record testimony is, and the Court finds that such subject matter of all of the claims in suit would have been obvious at the time the alleged inventions were made within the meaning of 35 U.S.C. § 103.

*The Subject Matter of All of the Claims in Suit of All Three Patents in Suit Is Obvious Within the Meaning of 35 U.S.C. § 103 in View of Contemporaneous Developments By Others*

83. All of the claims in suit are fully or substantially met by the bobbins separately developed by Johnson of Barber-Colman, by Howenstine of DeLuxe Coils, Inc., by Eller of DeLuxe Coils, Inc., prior to or contemporaneously with the separate development by the two Plaintiffs, Amerline and Honeywell, of the several versions disclosed in their patents in suit and on which all of the claims in suit are also readable.

84. The contemporaneous development by Amerline, Honeywell, Johnson of Barber-Colman, Howenstine of De-Luxe Coils, and Eller of DeLuxe Coils of their various bobbin designs, all meeting or substantially meeting all of the claims in suit, is persuasive evidence, and the Court finds the fact to be that the subject matter of all of those claims must have been obvious within the meaning of 35 U.S.C. § 103.

*The Subject Matter of All of the Claims in Suit of All Three Patents in Suit Is Anticipated By the Prior Art or Is Obvious from the Prior Art Within the Meaning of 35 U.S.C. § 103*

### 1. *Brekke and Brekke et al. Patents in Suit*

85. The Schlattner German patent disclosure responds in terms and in substance to every limitation of claims 4 and 5 of the Brekke patent in suit and all of the claims of the Brekke et al. patent in suit.

86. The Barber-Colman bobbin designed by Johnson responds in terms and in substance to every limitation of claims 4 and 5 of the Brekke patent in suit and all of the claims of the Brekke et al. patent in suit.

87. The DeLuxe Coils bobbin designed by Eller responds in terms and in substance to every limitation of claims 4 and 5 of the Brekke patent in suit and all of the claims of the Brekke et al. patent in suit.

88. The Howenstine electrical coil bobbin, except only for the fact that the slot opening from the winding space of Howenstine, which is later closed, initially extends directly through the slotted flange and opens through the outer surface thereof, responds to the substance of every limitation of claims 4 and 5 of the Brekke patent in suit and all of the claims of the Brekke et al. patent in suit. To dispense with the temporary opening through the outer surface of the flange of Howenstine and the utilitarian function served thereby, when making a bobbin in which such opening is not desired or needed, would be only a matter of ordinary engineering design and would have been obvious to one skilled in the relevant art within the meaning of 35 U.S.C. § 103.

### 2. *Brekke et al. Patent in Suit*

89. The Brekke patent in suit discloses, and claims 4 and 5 thereof broadly cover a bobbin having a diagonal slot that does not pass completely through the flange, which bobbin responds in terms and in substance to every limitation of

all of the claims of the Brekke et al. patent in suit.

90. The Brekke et al. patent in suit is for the same invention as the prior Brekke patent in suit, and all of the claims of the Brekke et al. patent differ only in scope from claims 4 and 5 of the Brekke patent. Since both of those patents are owned by Honeywell, it necessarily follows that Honeywell has secured two patents for the same invention.

3. *Muszynski et al. Patent in Suit*

91. The Barber-Colman bobbin designed by Johnson responds in terms and in substance to every limitation of all of the claims of the Muszynski et al. patent in suit, except only for the terminal lug limitations in claims 4 and 5 and the limitation in claim 5 calling for the coil wire connected to the terminal lug, which limitations may not be considered as defining anything invented by Muszynski et al. or as being a novel feature of their patent.

92. The DeLuxe Coils bobbin designed by Eller responds in terms and in substance to every limitation of all of the claims of the Muszynski et al. patent in suit, except only for the terminal lug limitations in claims 4 and 5 and the limitation in claim 5 calling for the coil wire connected to the terminal lug, which limitations may not be considered as defining anything invented by Muszynski et al. or as being a novel feature of their patent.

93. The Howenstine electrical coil bobbin responds in terms and in substance to every limitation of all of the claims of the Muszynski et al. patent in suit, except only for the fact that the slot opening from the winding space of Howenstine, which is later closed, initially extends directly through the slotted flange and opens through the outer surface thereof. To dispense with the temporary opening through the outer surface of the flange of Howenstine and the utilitarian function served thereby, when making a bobbin in which such opening is not desired or needed, would be only a matter of ordinary engineering design and would have been obvious to one skilled in the relevant art within the meaning of 35 U.S.C. § 103.

*Claims 3 and 4 of the Muszynski et al. Patent in Suit Cover an Old Combination*

94. Claims 3 and 4 of the Muszynski et al. patent in suit, by including terminal lugs in combination with a bobbin and a flange slot, and claim 4 of that patent, by including the coil wire passing through the slot from the bobbin tube and connected to the terminal lug, claim an old combination of elements in an old cooperative relationship disclosed by the prior art patent to Brekke et al. and also disclosed or suggested by additional prior art patents No. 424,703 to Clarke, No. 1,517,770 to Ziegler, No. 1,805,638 to Scofield et al., No. 1,815,212 to Ogg, and No. 1,950,156 to Swoboda. Therefore, these claims of the Muszynski et al. patent in suit claim more than the alleged invention of that patent.

*Misleading Statements and Evidence Furnished by Plaintiffs to the Patent Office*

95. Brekke misrepresented to the Patent Office the function and character of the opening completely through the flange of the prior art Howenstine electrical coil bobbin, which otherwise fully anticipated claims 4 and 5 in suit of that patent. Without that misrepresentation, there would have been no plausible basis for the Patent Office Examiner to have granted those claims as being patentable over the Howenstine electrical coil bobbin.

96. In the course of the prosecution of the application on which the Brekke patent in suit was granted, Brekke filed two affidavits with an amendment and argument for the purpose of showing "exceedingly great commercial success" of "the invention disclosed and claimed" in that application, and urged that such commercial success supported patentability of the claims of the Brekke application. Those affidavits and the accompanying argument referring thereto were so worded as to indicate that the diagonal slot versions disclosed and claimed in the Brekke application had in fact

met with such commercial success, whereas the evidence at the trial establishes that such diagonal slot versions had never been in commercial use as represented to the Patent Office and have not been used at any time by anyone to Brekke's knowledge.

97. The alleged commercial success of the subject matter disclosed and claimed in the Brekke patent, as initially misrepresented to the Patent Office, was repeatedly asserted thereafter during the prosecution of the Brekke application in support of patentability of the claims ultimately granted in the resulting Brekke patent in suit.

98. Substantially simultaneously with the filing of affidavits representing that the diagonal slots of the Brekke application had achieved "exceedingly great commercial success", similar affidavits and an accompanying amendment and argument were filed in the Brekke et al. application, representing to the Patent Office that the L-shaped slot version disclosed and claimed in that application had also achieved great commercial success. The latter papers gave the identical production figures given in the similar papers filed in the Brekke application, but, in this instance, specifically described the L-shaped slot as extending "generally in a plane parallel to the flange".

99. That the two sets of affidavits respectively filed in the Brekke and Brekke et al. applications were intended to be understood as referring to the different slot versions respectively disclosed in those applications is clearly indicated by the virtual identity of the two sets of affidavits except for the portions thereof describing the bobbins to which they referred. In the affidavits filed in the Brekke application, the portions describing the bobbins referred to the wire as being "passed into the flange on a diagonal" so as to suggest the diagonal slots disclosed and claimed in that application. In the affidavits filed in the Brekke et al. application, the portions describing the same bobbins differently describe the flange as being "slotted gen-erally in a plane parallel to the flange", a feature present only in the L-shaped slot disclosed and claimed in that application. The fact that the bobbins referred to in the two sets of affidavits actually were the same bobbin having only the L-shaped slot is evident from the identical production figures given in the two sets of affidavits, and also from the identification of the bobbin in both sets of affidavits as having been used "on the Modutrol motor" and in the "H" relay and "–28" transformer, and from the testimony of Brekke that no one had ever made and used a diagonal slot to his knowledge.

100. After the affidavits in the Brekke et al. application had been presented to show commercial success of the L-shaped slot disclosed and claimed therein, the same commercial success of the L-shaped slot was re-emphasized in the Brekke et al. application in the argument accompanying an amendment of September 26, 1961.

101. In the prosecution of the Brekke patent in suit in Division 61, the sole distinction mentioned (or existing) between claims 4 and 5 of the resulting Brekke patent in suit and the prior art Howenstine electrical coil bobbin considered by the Examiner was that those claims precluded the presence of an opening directly through the slotted flange that was present in the Howenstine electrical coil bobbin.

102. In the prosecution of the Brekke et al. patent in suit in Examining Group 270, the sole distinction mentioned (or existing) between each of the claims of the resulting Brekke et al. patent and the bobbin of Howenstine patent No. 3,-014,164 considered by the Examiner was that "continuous" outer flange surface required by the Brekke et al. claims precluded the presence of an opening directly through the slotted flange that existed in the bobbin of the Howenstine patent. In substance, this same distinction was the only one existing between claims 4 and 5 in suit of the Brekke patent and the similar Howenstine electrical coil bobbin.

103. In the prosecution of the Muszynski et al. patent in suit in Examining Group 270, the only distinction mentioned (or existing) betweeen each of the claims of the resulting Muszynski et al. patent and the bobbin of Howenstine patent No. 3,014,164 was that the claims of the Muszynski et al. patent required the slot or "pocket" in the flange to be "completely closed" at the outer surface of the flange so as to preclude the presence of an opening directly through the slotted flange from the winding space that existed in the Howenstine patent. In substance, this same distinction was the only one existing between all of the claims in suit of both the Brekke and Brekke et al. patents and the Howenstine electrical coil bobbin or the similar bobbin of the Howenstine patent.

104. It is evident from a comparison of the claims in suit of all three patents in suit with the prior art Howenstine electrical coil bobbin and with the similar prior art bobbin of the Howenstine patent that all of the claims in suit of all three patents in suit contained only the same, single distinction from that prior art. It is clear, therefore, that all three of the patents in suit were granted for the same alleged invention, namely, closing the opening through the outer surface of the flange of similar prior art bobbins that otherwise fully anticipated all of the claims in suit.

## II. CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter and the parties hereto.

2. Claims 4 and 5, the only claims in suit, of Brekke patent No. 3,083,930 are invalid.

3. All the claims of Muszynski et al. patent No. 3,117,294 are invalid.

4. All the claims of Brekke et al. patent No. 3,131,371 are invalid.

5. Contemporaneous developments by many workers in this field demonstrate that the subject matter of all of the claims in suit of all three patents in suit was obvious within the meaning of 35 U.S.C. § 103.

6. Plaintiffs' reliance on a presumption of validity, commercial success, fulfilling unsolved needs, and other secondary considerations is of no avail where, as here, novelty and/or unobviousness are clearly lacking as to all of the claims in suit of all three patents in suit.

 7. There is no presumption of validity as against prior art not considered by the Patent Office, or as against prior art considered by the Patent Office when its true pertinence was disguised by false or misleading evidence and statements presented to the Patent Office.

8. Defendant is entitled to costs.